# No. 21-2158

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

ST. MICHAEL'S MEDIA, INC.
*Plaintiff-Appellee*

v.

MAYOR AND CITY COUNCIL OF BALTIMORE, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Maryland at Baltimore
Case No. 1:21-cv-2337
Hon. Ellen L. Hollander, U.S. District Judge, presiding

**Amicus brief for The Satanic Temple, Inc.
In support of St. Michael's Media, Inc.
Arguing for affirmance**



Matthew A. Kezhaya
KEZHAYA LAW PLC
333 N. Washington Ave., # 300
Minneapolis, MN 55401
(479) 431-6112
matt@kezhaya.law

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-2158__      Caption: _St. Michael's Media, Inc. v. Mayor and City Council of Baltimore et al_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_The Satanic Temple, Inc._
(name of party/amicus)


who is _____amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO


2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Matthew A. Kezhaya          Date:   November 3, 2021

Counsel for: The Satanic Temple, Inc.

Print to PDF for Filing

# TABLE OF CONTENTS

Table of contents.................................................................i

Table of authorities ..........................................................ii

Statement of interest.........................................................1

Summary of the argument .................................................3

Argument ..........................................................................4

    1: The District Court overcomplicated the analysis. ..................4

    1.1: The event was religious.................................................5

    1.2: Strict scrutiny could be reached by the "hybrid rights" test or the "discretion" test. ...............................................8

    1.3: Deprivation of Free Exercise rights is irreparable harm. ................14

    1.4: Because motivation is irrelevant, it should not be inquired into.......14

Conclusion ......................................................................18

# TABLE OF AUTHORITIES

## Cases

*Am. Legion v. Am. Humanist Ass'n*,
   139 S. Ct. 2067, 204 L. Ed. 2d 452 (2019).................................. 12

*Cantwell v. Connecticut*,
   310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)..................................... 18

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)........................... 15

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
   494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)............ 8, 13, 14, 16

*Fulton v. City of Philadelphia, Pennsylvania*,
   141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021)......................................... passim

*Helvering v. Gowran*,
   302 U.S. 238, 58 S. Ct. 154, 82 L. Ed. 224 (1937)....................................... 9

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94, 73 S. Ct. 143, 97 L. Ed. 120 (1952) ...................................... 11

*Kentucky v. Graham*,
   473 U.S. 159, 105 S. Ct. 3099 (1985) ....................................................... 19

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) ....................................................................... 18

*Lemon v. Kurtzman*,
   403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971) .............................. 19

*Lund v. Rowan Cty., N. Carolina*,
   863 F.3d 268 (4th Cir. 2017) ...................................................................... 9

*Malnak v. Yogi,*
    592 F.2d 197 (3d Cir.1979) ...................................................................... 10

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    ___ U.S. ___, 138 S. Ct. 1719 (2018) ..................................................... 14

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020) ............................................... 11

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,*
    450 U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981) ........................... 12

*Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich,*
    426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976) .......................11, 20

*Sherbert v. Verner,*
    374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963) .......................... 8, 13

*Suydam v. Williamson,*
    61 U.S. 427, 15 L. Ed. 978 (1857) ............................................................. 10

*United States v. Seeger,*
    380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) ................................. 10

*W. Virginia State Bd. of Educ. v. Barnette,*
    319 U.S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) ...........................19, 20

*Wisconsin v. Yoder,*
    406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ............................... 14

*Young v. Am. Mini Theatres, Inc.,*
    427 U.S. 50, 96 S. Ct. 2440, 49 L. Ed. 2d 310 (1976) ................................ 6

**Other Authorities**

Fourth Tenet, The Satanic Temple................................................................. 6

Louis S. Raveson, *Unmasking the Motives of Government Decisionmakers: A*

    *Subpoena for Your Thoughts*, 63 N.C. L. Rev. 879 (1985) ............................ 20

**Constitutional Provisions**
U.S. Const. Amend. I..............................................................................12, 19

## STATEMENT OF INTEREST[1]

The Satanic Temple, Inc. ("**TST**") is an atheistic religious corporation with membership exceeding 530,000 throughout all 50 States and internationally. TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny.  For TST and its membership, the Satan described in Paradise Lost and like works is a revolutionary antihero who stood up against impossible odds to seek justice and egalitarianism for himself and others.

This view of Satan inspired TST's Seven Tenets, a creed also heavily influenced by the rationalist philosophers, religious iconography and group ritual, and public displays of religious activism.  Examples of TST's activism include demands for an equal right to participate in public displays of religion and demands for religious exemptions from ostensibly-neutral laws.

This activism tends to spark heated debates about First Amendment values. To quell the controversy or to suppress TST's viewpoint, governments regularly opt to silence TST.  As below, a recurring justification is a trumped-up charge of "public safety concerns."  Thus, if the Court reverses the below decision, all governments in the Fourth Circuit will have a handy template for prohibiting

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than the *amicus*, its members, or its counsel made a monetary contribution to fund the brief's preparation or submission.  All parties consented to the filing of this brief.

1

TST's religious activism.  Next time it could be us.  Or any of our friends across the religious spectrum, whose practices are infringed upon by the political class.

Make no mistake: TST *strenuously* disagrees with St. Michael's religious viewpoints.  The Catholic Church's failure to appropriately address the child sex abuse scandals suggests it should be abandoned, not fixed within; and one will not soon find TST's membership praying the Rosary.  TST also disagrees with the statements the City has attributed to Steve Bannon and Milo Yiannopoulos. It is completely antithetical to TST's ideology for these speakers to advocate for violence, racism, misogyny, or the overthrow of the American government.

Our advocacy for an affirmance is rooted, not in an endorsement of St. Michael's or these speakers, but in the outrage that the City of Baltimore tried to silence them.  The maxim commonly attributed to Voltaire puts it best: "I disapprove of what you say, but I will defend to the death your right to say it." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 63, 96 S. Ct. 2440, 2449, 49 L. Ed. 2d 310 (1976) (quoting S. Tallentrye, The Friends of Voltaire 199 (1907)); see also the Fourth Tenet, The Satanic Temple ("The freedoms of others should be respected, including the freedom to offend.  To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.")

2

## SUMMARY OF THE ARGUMENT

The District Court declined to consider the Free Exercise Clause claim because St. Michael's counsel conceded that there was no proof of denominational preference. But strict scrutiny always attaches to a government's discretionary decision to stop religious speech, even without proof of motivation.

Denominational preference does not control, under the "hybrid rights" test, because the Free Exercise claim reinforces a Free Speech claim. Here, the event contemplated both prayer and protected speech about an ecclesiastical concern. It is plainly the type of hybrid rights situation which commands strict scrutiny.

Similarly, under the "discretion" test, the City purported to reserve a discretionary and unilateral veto on any speaker it chooses. It could have allowed this religious event, yet it chose not to. The veto must survive strict scrutiny.

The District Court overcomplicated the analysis by disregarding the Free Exercise claim and by engaging in a piercing inquiry into the City's subjective motivations. We have a government of laws, not of motivations. Luckily, St. Michael's had compelling proof of viewpoint discrimination, but what if the City had done a better job of concealing its improper motivations? The right to free exercise does not, and should not, turn on having unassailable proof of pretext. The Free Exercise Clause claim is the path of least resistance to affirm.

## ARGUMENT

## 1: The District Court overcomplicated the analysis.

The District Court overcomplicated the analysis when it held that there is "no evidence" to support the Free Exercise Clause claim. (**A.A. 173**). This holding presupposes that the Free Exercise Clause claim requires proof that the hierarchy of the Catholic Church had a hand in prohibiting the event. (**A.A. 127**) (St. Michael's alleged this, but had no evidence to prove it).

It was legal error to deny the Free Exercise Claim, either: (1) under the "hybrid rights" test of *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 882, 110 S. Ct. 1595, 1602, 108 L. Ed. 2d 876 (1990); or (2) under the "discretion" test of *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1878, 210 L. Ed. 2d 137 (2021) . Neither test requires proof of intent. What matters is the effect: a governmental decision caused a religious hardship. *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S. Ct. 1790, 1794, 10 L. Ed. 2d 965 (1963).

Ultimately, the District Court came to the right decision – strict scrutiny attaches because the City intervened to stop the event (**A.A. 171-72**) – but that same conclusion could have been reached if the District Court had considered that the City stopped, not just any event, but a *religious* event. There was no need to fuss about what kind of forum the Pavilion is or whether the City engaged in viewpoint discrimination.

4

The District Court correctly found that the City's intervention could not survive strict scrutiny, but the City offers no strict scrutiny defense on appeal. Thus, this Court should affirm. *E.g. Helvering v. Gowran*, 302 U.S. 238, 245, 58 S. Ct. 154, 158, 82 L. Ed. 224 (1937) ("if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.")

### 1.1: The event was religious.

Under either the "hybrid rights" test or the "discretion" test, the crux of the argument is that the event was religious. The District Court helpfully issued detailed findings of fact about the nature of St. Michael's and this event. (**A.A. 106-128**); compare *Lund v. Rowan Cty., N. Carolina*, 863 F.3d 268, 275 (4th Cir. 2017) (constitutional facts are reviewed de novo); see also the City's opening brief at pp. 2-6 (the City does not challenge the below facts).

The material facts are these: (1) St. Michael's is a Catholic organization which sometimes dissents from the Catholic Church's hierarchy (**A.A. 106**); (2) St. Michael's intended to host an event at the City-owned Pavilion (**A.A. 108**); (3) the City claimed sole discretion to veto any event to be held at the Pavilion (**A.A. 111-12**); (4) St. Michael's event would involve criticism of the Catholic Church on matters of doctrine and the handling of the child sex abuse scandals

(**A.A. 106-107**); (5) the event would also involve prayer (**A.A. 112**); and (6) the City intervened to stop the event (**A.A. 118-19**).

The District Court found that the event was religious. (**A.A. 142**). But, because the issue of religiosity is dispositive to this argument, we think it necessary to explain why the event was religious. To determine whether the event was "religious," this Court must resolve two questions: (1) are the beliefs sincerely held; and (2) are they religious in the plaintiff's "scheme of things." *United States v. Seeger*, 380 U.S. 163, 185, 85 S. Ct. 850, 863, 13 L.Ed.2d 733 (1965).

Sincerity is easy. St. Michael's "sincerely" holds its beliefs because it claims to be sincere and the City offered nothing to rebut the claim. *Id.*, 380 U.S. at 184 ("great weight" must be given to a plaintiff's assertion of sincerity). The burden was on the City, as appellant, to bring up a record sufficient to demonstrate that the trial court erroneously found that the event was religious. *Suydam v. Williamson*, 61 U.S. 427, 433, 15 L. Ed. 978 (1857).

St. Michael's beliefs are also religious in its "scheme of things." The test is whether the beliefs occupy a place which is "parallel to that filled by the orthodox belief in God." *Seeger*, 380 U.S. at 166; see also *Malnak v. Yogi*, 592 F.2d 197, 208 (3d Cir.1979) (Adams, J., concurring). St. Michael's, being a Catholic group, holds precisely the orthodox belief in God. Its beliefs are plainly religious in its "scheme of things."

6

Moreover, this event was religious. First, because it would involve Catholics criticizing the Catholic Church on matters of Catholic doctrine and on the Church's handling of the child sex abuse cases. (**A.A. 106-107**). Under the Free Exercise Clause, faith groups have the "power to decide for themselves, *free from state interference*, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S. Ct. 143, 154, 97 L. Ed. 120 (1952) (emphasis added).

Matters of internal church government are at the "core" of the ecclesiastical affairs protected by the Free Exercise Clause. *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 721, 96 S. Ct. 2372, 2386, 49 L. Ed. 2d 151 (1976); see also *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060, 207 L. Ed. 2d 870 (2020) (State interference in the sphere of religious institutions to decide matters of faith and doctrine violates the Free Exercise Clause). The event was religious because it was an assembly of Catholics advocating for changes in the Catholic Church's doctrine and the Catholic Church's ecclesiastical government.

Second, the event was religious because it was to involve praying the Rosary. (**A.A. 112**). "Praying the Rosary" is a traditional Catholic series of prayers. (**A.A. 13** at ¶ 43). As used in this context, "prayer is by definition religious." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2087, 204 L. Ed. 2d 452

(2019). The prayer was not incidental to the event, it was a direct expression of the rally-goers' challenge to the legitimacy of the United State Conference of Catholic Bishops. (**Id.**) That is not to say, of course, that the prayer's centrality to the event is case-dispositive. An "indirect" prohibition on prayer, by canceling an event in which prayer incidentally happens, is just as unconstitutional as a direct prohibition on prayer at the event. *See Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 1432, 67 L. Ed. 2d 624 (1981). The event was religious because it involved group engagement in a ritual under a framework which they considered to be religious.

### 1.2: Strict scrutiny could be reached by the "hybrid rights" test or the "discretion" test.

Assuming the Court agrees that the event was religiously motivated, strict scrutiny could be reached, without inquiring into governmental motivations, under the *Smith* "hybrid rights" test or the *Fulton* "discretion test." Both derive from the Free Exercise Clause of the First Amendment. U.S. Const. Amend. I ("Congress shall make no law . . . prohibiting the free exercise [of religion].")

#### *1.2.1: The City stopped religiously-motivated protected speech.*

The "hybrid rights" test commanded strict scrutiny without the need to divine the City's subjective intent. The District Court should have applied strict scrutiny upon finding that this event was religiously-motivated "protected speech."

8

Instead, it held St. Michael's to proof on its claim of religious bias. But proof of motive was unnecessary under the "hybrid rights" test, which holds that a governmental infringement on a religious practice must survive scrutiny if it implicates another constitutional right in addition to the Free Exercise Clause. *Smith*, 494 U.S. at 881-82.

The "hybrid rights" test was no expansion of Free Exercise Clause scrutiny. Before *Smith*, the test was "if the purpose *or effect* of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." *Sherbert*, 374 U.S. at 404 (emphasis added).

In *Sherbert*, a statutory scheme withheld unemployment benefits from a claimant who, because of her religious beliefs, refused to work on a Saturday. This required strict scrutiny, even without proof that the statutes were drafted for the purpose of affecting the claimant's religious practice of Saturday worship.

What mattered was the effect. The government had imposed a choice: the claimant could either keep all of the precepts of her religion or qualify for a governmental benefit on equal terms as those who do not worship on Saturday; not both. *Id.* This unconstitutionally "puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.;* see also *Wisconsin v. Yoder*, 406 U.S. 205, 214–15, 92 S. Ct. 1526,

9

1532–33, 32 L. Ed. 2d 15 (1972) (a law mandating compulsory school attendance violated Free Exercise for interfering with the Amish religious faith, even without proof of discriminatory intent behind the law).

The *Smith* Court modified the Free Exercise Clause so that it would not be offended by a "neutral" and "generally applicable" regulation, provided that no other constitutional protections were implicated. *Smith*, 494 U.S. at 881-82. Under this framework, the other claim is "reinforced by Free Exercise Clause concerns." *Id.* at 882. The right to engage in religiously-motivated protected speech qualifies for strict scrutiny under the "hybrid rights" test. *Id.* at 881 (citing *Cantwell v. State of Connecticut*, 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); and *Follett v. McCormick*, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944)).

St. Michael's asserted religious discrimination by alleging that the Catholic Church had something to do with the City's decision to cancel the event. (**A.A. 12** at ¶ 26). Proof of religious animus will defeat the "neutrality" requirement, true, but the issue of whether the governmental decision was neutral only controls if the Free Exercise claim stands alone. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, ___ U.S. ___, 138 S. Ct. 1719, 1731-32 (2018) (proceedings invalidated because the "religious objection was not considered with the *neutrality* that the Free Exercise Clause requires") (emphasis added); *Church of the*

10

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542, 113 S. Ct. 2217, 2231, 124 L. Ed. 2d 472 (1993) (invalidating facially-neutral ordinances because, "The ordinances had as their object the suppression of religion.")

St. Michael's allegation of religious bias, and proof thereof, was unnecessary under the "hybrid rights" test. The City could no more bar this event, because it was to take place in the City-owned Pavilion, than it could act to bar the same event at a public park or on private property. The forum is irrelevant, what matters is the effect: the City prohibited religiously-motivated protected speech.

The District Court correctly found that the event was both "protected speech" and was to feature religious content. (**A.A. 144**). It was error for the District Court to further require strict proof on St. Michael's claim of religious animus. This was harmless error, however, because the District Court found that the City's decision could not survive strict scrutiny. The City does not justify how its veto can survive strict scrutiny. Thus, this Court should affirm.

### 1.2.2: The City had discretion to allow the event.

Additionally, strict scrutiny could have been reached upon finding that the City purported to reserve boundless discretion to prohibit any performance. The District Court addressed this issue from a Free Speech Clause perspective (**A.A. 160-62**), but the Supreme Court has just explained that the Free Exercise Clause finds boundless discretion just as offensive. See *Fulton*, 141 S. Ct. at 1877-78.

Recall, other than in a hybrid rights case, the Free Exercise Clause question is whether the regulation is "neutral" and "generally applicable." *Smith*, 494 U.S. at 881. A law is not "generally applicable" if it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (cleaned up) (quoting *Smith*, 494 U.S. at 883).

Thus, the "discretion" test holds that if a government has discretion to accommodate a religious practice, it must. *See id.*, 141 S. Ct. at 1878. Otherwise, the religious hardship is not really being caused by a "generally applicable" regulation, it is really being caused by a governmental refusal to accommodate the religious practice. *See id.* If a government refuses to accommodate the religious practice, though it can, the refusal must satisfy strict scrutiny. *Id.*, 141 S. Ct. at 1881.

In *Fulton*, a contractual prohibition against sexual orientation discrimination was not "generally applicable" because the city reserved the discretion to grant exemptions. *Id.*, 141 S. Ct. at 1878. The city refused to exercise its discretion to extend an exemption, causing a religious hardship. *Id.* As a result, even without proof that the City created the prohibition for the purpose of causing that religious hardship, strict scrutiny applied. *Id.* This was true even though, as here,

12

the issue arose in a contracting relationship. *Id.* It was also irrelevant that the City had never before given a discretionary exemption. *Id.*, 141 S. Ct. at 1879.

What mattered was the effect. A government had created a formal discretionary mechanism for granting exemptions. Under the *Fulton* "discretion" test, once a government allows for some exemptions, the Free Exercise Clause commands that religious exemptions be allowed in, too. Otherwise, the failure to accommodate must be satisfied by strict scrutiny.

Here, the City reserves boundless discretion to veto a performance at this venue. (**A.A. 111-12**). The City offered no standards, no policies, and no procedures to preclude consideration of the particular reasons for a person's conduct. (**A.A. 112**). Quite the contrary, the City proudly explains that it exercised its veto to preclude the event *because of* the City's imagined reasons for the event. E.g. City's opening brief at p. 2 (the City vetoed the event based on its self-serving claim that the reason for the event is to advocate political violence); see also (**A.A. 116**) (the City's third-party management company, on behalf of the City, specifically inquired into the purpose of the event).

The City could have been silent and allowed its third-party management company to contract with St. Michael's on presumably equal terms as any other organization. (**A.A. 116-17**). Instead, the City blithely engaged in the very kind of content-based evaluation process of religiously-motivated protected speech

13

which has been uniformly held unconstitutional for decades.  See *Cantwell v. Connecticut*, 310 U.S. 296, 303-07, 60 S.Ct. 900, 903-05 84 L.Ed. 1213 (1940) (subjecting the statute to heightened scrutiny *because* the exemptions lied in the discretion of a government official).

Upon the City's choice to veto the event (**A.A. 118-19**), which caused a religious hardship, the decision needed to survive strict scrutiny under the "discretion" test.  The City did not offer below, and does not offer now, any argument for how its discretionary veto can survive strict scrutiny.  Because the District Court correctly held that the City failed its burden, this Court should affirm.

### 1.3: Deprivation of Free Exercise rights is irreparable harm.

Assuming the Court agrees that the Free Exercise Clause required strict scrutiny of the City's discretionary decision to stop a religious event, immediate judicial action was appropriate to avoid the irreparable harm of a constitutional violation.  *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

### 1.4: Because motivation is irrelevant, it should not be inquired into.

A cynic would say that this brief offers the Court no more than an "easy button" to affirm.  That is not our purpose.  We take issue with a pattern of judicial refusal to hold governments accountable when constitutional rights are

14

infringed, without proof of motive, as if qualified immunity has any application in an official-capacity lawsuit. *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105-06 (1985) (it doesn't). The rights at issue in this case are so fundamental to a free society that the Founding Fathers withdrew them from the "vicissitudes of political controversy" and established them as legal principles, to be apply by the courts. *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 1185–86, 87 L. Ed. 1628 (1943). Whether these fundamental rights have been infringed is a legal issue, not a factual one.

Yet, too often, governments have trampled upon these rights, only to be free of accountability because the plaintiff was unable to prove that it was the government's subjective purpose to infringe upon the right. The First Amendment does not provide that Congress *may knowingly* make a law prohibiting the free exercise of religion; or abridging the freedom of speech; or the right of the people peaceably to assemble. U.S. Const. Amend. I. No, the First Amendment says Congress *shall not* make such laws. Intent is irrelevant, what matters is the effect.

Lest we forget, the First Amendment was drafted to avoid political division along religious lines. *Lemon v. Kurtzman*, 403 U.S. 602, 622, 91 S. Ct. 2105, 2116, 29 L. Ed. 2d 745 (1971); and *id*. at 603 ("the Constitution's authors sought to protect religious worship from the pervasive power of government.") The City had before it a religious event, took a political issue with two of the 16

15

speakers (**A.A. 114**), and so it vetoed the event. By squelching St. Michael's religious speech for a political purpose, the City engaged in the very conduct the Founding Fathers sought to prohibit.

There was no need for St. Michael's to prove that the City "intentionally" intervened on behalf of the Catholic Church. We have a government of laws, not of motivations. *Barnette*, 319 U.S. at 655 (Frankfurter, J., dissenting) ("Law is concerned with external behavior and not with the inner life of man.") In *Milivojevich*, it was error for the Illinois Supreme Court to interfere with matters of church government without any proof of religious animus on the part of the Illinois Supreme Court justices. *Milivojevich*, 426 U.S. at 721-22.

Historically, the judiciary was averse to inquiring into governmental motivations, and for good reasons. See Louis S. Raveson, *Unmasking the Motives of Government Decisionmakers: A Subpoena for Your Thoughts*, 63 N.C. L. Rev. 879, 883-889 and 930 (1985) (Available at: http://scholarship.law.unc.edu/nclr/vol63/iss5/3). Fundamentally, the inquiry amounts to an intrusion of separation of powers, will run into governmental claims of immunity from a searching inquiry, and necessarily involves the suggestion of bad faith on the part of the government officials. Id.

Over time, the constitutional inquiry has begun to morph from "a right was infringed" to "but was it infringed on purpose?" That shift in thinking is

16

apparent on this record.  The District Court conflated the analysis by holding that a lack of proof about subjective motivations must mean that the right was not violated.  But the "why" only becomes relevant after determining what level of scrutiny the City's decision must survive.  The "why" speaks to whether the City has a "compelling reason" to infringe upon fundamental rights, not whether the rights were infringed upon in the first place.  *E.g. Fulton*, 141 S. Ct. at 1881-82.

St. Michael's had a fundamental right to engage in this conduct.  It was not a privilege to be doled out in the discretion of the local political ruling class.  It does not derive from proving bad faith on the government officials who purport to have discretion to intervene on that right.  It derives from the very foundation of our great republic, that very basis for our free society.  And if it is bad for the City's Pavilion business to adhere to the constitutional mandate that governments *shall not* prohibit the free exercise of religion, then maybe the City should not own a for-profit entertainment venue.

17

## CONCLUSION

**WHEREFORE** The Satanic Temple, Inc. prays this Court **AFFIRM** because the event was religiously-motivated protected speech which was prohibited by a government, the Free Exercise claim supported a Free Speech claim, and the City had discretion to not veto this religious event, yet vetoed it all the same. The City's intent was irrelevant to resolving whether strict scrutiny applied. What matters is the effect.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. __21-2158__    **Caption:** _St. Michael's v. Mayor & City Council of Baltimore et al._

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.  Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ____4058____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
MS Word (Office 365 version)_____ [*identify word processing program*] in
14pt Calisto MT_____ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Matthew A. Kezhaya_____

Party Name _The Satanic Temple, Inc._____

Dated: _November 3, 2021___